# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No.  3:19-cv-135 |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| INFRAREIT, INC., DAVID A. CAMPBELL, JOHN GATES, STORROW M. GORDON, TRUDY A. HARPER, HUNTER L. HUNT, HAROLD R. LOGAN, JR., HARVEY ROSENBLUM, and ELLEN C. WOLF, | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of InfraREIT, Inc. ("InfraREIT" or the "Company") against InfraREIT and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which InfraREIT will be acquired by Oncor Electric Delivery Company LLC ("Oncor"), through its wholly owned subsidiary 1912 Merger Sub LLC ("Merger Sub") (the "Proposed Transaction").

2.      On October 18, 2018, InfraREIT issued a press release announcing it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to be acquired by Oncor for $21.00 in cash per InfraREIT common share (the "Merger Consideration").   The Proposed Transaction is valued at approximately $1.275 billion, excluding InfraREIT's net debt.

3.      As a condition to Oncor's acquisition of InfraREIT, InfraREIT's subsidiary Sharyland Distribution & Transmission Services, L.L.C. ("SDTS"), SDTS' tenant, Sharyland Utilities, L.P. ("Sharyland"), and Oncor signed a definitive agreement to exchange SDTS' South Texas assets for Sharyland's Golden Spread Electric Cooperative interconnection ("Golden Spread Project") located in the Texas Panhandle along with certain development projects including the Lubbock Power & Light interconnection ("LP&L Project") (the "Asset Exchange").

4.      Concurrently with the execution of the Merger Agreement and Asset Exchange agreement, Sharyland and Oncor's majority owner, Sempra Energy ("Sempra"), entered into an agreement in which Sempra will purchase a 50% limited partnership interest in Sharyland Holdings LP ("Sharyland Holdings") which will own a 100% interest in Sharyland.  The closing of Sempra's purchase is a requirement of the Asset Exchange.

5.      Upon closing of the Asset Exchange and Proposed Transaction, Oncor will own all of the Company's existing transmission systems excluding the South Texas assets, and will also own the Golden Spread Project and the LP&L Project.  In addition, the management agreement between InfraREIT and its external manager, Hunt Utility Services, LLC ("Hunt Manager"), will be terminated and Hunt Manager will become entitled to payment of a termination fee of approximately $40.5 million pursuant to the terms of the management agreement.

6.    On January 4, 2019, InfraREIT filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that InfraREIT stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) InfraREIT's financial projections relied upon by the Company's financial advisor Evercore Group L.L.C. ("Evercore") in its analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Evercore; (iii) the background process leading to the Proposed Transaction; and (iv) potential conflicts of interest faced by Evercore.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as InfraREIT stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

7.    In short, unless remedied, InfraREIT's public stockholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

9.    This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an

individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  InfraREIT is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of InfraREIT common stock.

12.     InfraREIT is a Maryland corporation and maintains its principal executive offices at 1900 North Akard Street, Dallas, Texas 75201.  InfraREIT owns and leases rate-regulated electric transmission assets in Texas.  InfraREIT's common stock is traded on the New York Stock Exchange under the ticker symbol "HIFR."

13.     Defendant David A. Campbell ("Campbell") has been President and Chief Executive Officer ("CEO") of InfraREIT since August 2014 and a director of the Company since September 2014.  Defendant Campbell is also President of Hunt Manager and President and CEO of Sharyland.

14.     Defendant John Gates ("Gates") has been a director of the Company since January 2015.

15.     Defendant Storrow M. Gordon ("Gordon") has been a director of the Company since January 2015.

16.     Defendant Trudy A. Harper ("Harper") has been a director of the Company

since January 2015.

17.     Defendant Hunter L. Hunt ("H. Hunt") has been a director of the Company since September 2013. Defendant H. Hunt is co-Chairman, co-CEO, and co-President of Hunt Consolidated, Inc. ("HCI" and together with its affiliates, "Hunt"). Defendant Hunt has also been the Chairman of Sharyland since 1999.

18.     Defendant Harold R. Logan, Jr. ("Logan") has been Chairman of the Board since February 2018. Defendant Logan previously served as Lead Director of the Company from January 2015 until February 2018 and as a non-voting director of the Company's predecessor from February 2014 until joining the Company in January 2015.

19.     Defendant Harvey Rosenblum ("Rosenblum") has been a director of the Company since January 2015.

20.     Defendant Ellen C. Wolf ("Wolf") has been a director of the Company since January 2015 and previously served as non-voting director of the Company's predecessor since February 2014.

21.     Defendants Campbell, Gates, Gordon, Harper, H. Hunt, Logan, Rosenblum and Wolf are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

22.     Oncor is a Delaware limited liability company with its principal executive offices located at 1616 Woodall Rodgers Fwy., Dallas, Texas 75202. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to over 3.6 million homes and businesses.

23.     Merger Sub is a Delaware limited liability company and a wholly-owned subsidiary of Oncor.

24.     InfraREIT Partners, LP ("Operating Partnership") is a Delaware limited partnership that owns all of the Company's properties.  InfraREIT is the sole general partner of the Operating Partnership, owning approximately 72.1% of the Operating Partnership's units.

25.     Sharyland is a Texas limited partnership, privately owned and managed by defendant H. Hunt.  Sharyland is a Texas-based regulated electric utility that leases all of InfraREIT's and its subsidiaries' regulated assets.

26.     SDTS is a Texas limited liability company and indirect subsidiary of the Operating Partnership.  SDTS is a Texas-based regulated electric utility and currently leases all of its assets to Sharyland pursuant to five separate leases.

27.     Hunt and its affiliates comprise one of the largest privately-owned energy companies in the world, engaged in exploration, production, and liquefied natural gas activities. All members of InfraREIT senior management are employees of, and compensated by, Hunt Manager.

28.     Sempra is a California corporation and Fortune 500 energy-services holding company, whose businesses invest, develop and operate energy infrastructure and provide gas and electricity services to their customers in North and South America.  Sempra indirectly owns an 80.25% interest in Oncor.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own InfraREIT common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

30.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.  The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of January 3, 2019, there were 43,997,672 shares of InfraREIT common stock outstanding.  All members of the Class may be identified from records maintained by InfraREIT or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

31.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

32.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

34.     Defendants have acted, or refused to act, on grounds generally applicable to the

Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

35.     InfraREIT owns and leases rate-regulated assets in the Texas Panhandle. InfraREIT conducts its business through an umbrella partnership real estate investment trust ("REIT") in which all of the Company's properties are owned by the Operating Partnership and all of its business activities are conducted through the Operating Partnership.  InfraREIT leases its regulated assets to Sharyland, which then delivers electric service to other utilities.  The Company's regulated assets consist of approximately 1,373 circuit miles of transmission lines, substations, a 300-megawatt high-voltage DC Tie[1] between Texas and Mexico, and a transmission operations center.  The Company's rate base has grown from approximately $60 million as of December 31, 2009 to approximately $1.5 billion as of December 31, 2017.

36.     InfraREIT has reported solid financial results in recent quarters.  For example, on May 3, 2018, the Company reported its first quarter of 2018 financial results.  For the quarter, lease revenue increased 15% to $45.7 million, compared to $39.6 million in the first quarter of 2017.  Net income was $17.8 million, or $0.29 per share, compared to $11.0 million, or $0.18 per share, in the first quarter of 2017.  Non-GAAP earnings per share ("EPS") increased 45% to $0.29 per share, compared to $0.20 per share in the first quarter of 2017.  The Company projected EPS guidance for 2018 in the range of $1.29 to $1.39.

37.     On August 1, 2018, the Company reported its second quarter and first half of

---

[1] According to the Company's March 5, 2018 Form 10-K, a DC Tie is defined as a "high-voltage direct current interconnection necessary to provide for electricity flow between asynchronous electric grids in North America."

2018 financial results.  Notably, InfraREIT improved its guidance for 2018, projecting EPS in the range of $1.36 to $1.46.  For the quarter, net income was $23.9 million, or $0.39 per share, compared to $10.1 million, or $0.17 per share, in the second quarter of 2017.  Lease revenue was $47.8 million, compared to $40.4 million in the second quarter of 2017.  Non-GAAP EPS was $0.29 per share, compared to $0.20 per share in the second quarter of 2017.  For the first half of 2018, net income was $41.7 million, compared to $21.1 million for the first half of 2017.  Lease revenue was $93.5 million for the first half of 2018, compared to $80.0 million for the first half of 2017.

**The Sale Process**

38.    On February 28, 2017, Hunt filed an amendment to its Schedule 13D with the SEC, stating that it might begin developing and evaluating scenarios that may involve possible alternatives to the current business structures and arrangements in place between InfraREIT and its subsidiaries, including SDTS, on the one hand, and Hunt and its affiliates, including Sharyland, on the other hand.

39.    On January 10, 2018, the Company disclosed that it was continuing to review its REIT election and the existing lessor-lessee relationship with Sharyland, including consideration of whether InfraREIT should terminate its REIT status and instead opt for a traditional C-corporation structure.

40.    On January 16, 2018, Hunt filed an amendment to its Schedule 13D with the SEC stating that Hunt was focusing on alternative arrangements that would enable it to maintain a substantial equity stake in InfraREIT or the Operating Partnership and continue to actively participate in, and exercise a substantial degree of influence over, the business and affairs of these entities.

41.     Beginning in February 2018 and ending in May 2018, the Company entered into approximately 30 confidentiality agreements with various potential counterparties, including Oncor and Sempra.

42.     The Board's conflicts committee (the "Conflicts Committee") held meetings on March 20, 2018, April 9, 2018 and May 1, 2018 with senior management and representatives from Evercore and the Conflicts Committee's counsel, Hunton Andrews Kurth LLP ("Hunton") and Jackson Walker LLP ("Jackson Walker").   The participants discussed a potential going private offer from Hunt, including timing and processes for negotiations.   Senior management then reviewed its financial projections for various de-REIT scenarios and the Conflicts Committee approved such financial projections for use by representatives from Evercore.   On March 20, 2018, the Conflicts Committee formally entered into an engagement letter with Evercore as its independent financial advisor in connection with its evaluation of a possible sale of the Company.

43.     On May 16 and May 17, 2018, the Conflicts Committee met with senior management and representatives from Evercore, Hunton and Jackson Walker and discussed, among other things, various de-REIT alternatives, including senior management's financial projections for such alternatives and the various impacts of such alternatives on the Company.

44.     On May 24, 2018, representatives of Oncor and Sempra met with defendant Campbell and Stacey H. Doré, Senior Vice President and General Counsel of InfraREIT.   Oncor and Sempra submitted a proposal (the "May 24 Proposal") to acquire all of the outstanding equity interests in InfraREIT and the Operating Partnership for total equity consideration of $1.267 billion, less (i) the payment of a termination fee to Hunt under the management agreement of approximately $40 million; and (ii) any InfraREIT advisor fees and an estimate of

fees and expenses required to be paid to lenders for debt consents. Based on approximately 60.7 million shares of common stock and partnership units outstanding, the Conflicts Committee viewed that this would result in consideration of approximately $19.88 per share of InfraREIT common stock and partnership unit. Additionally, the May 24 Proposal contemplated a payment to Hunt by Oncor for certain transaction-related fees and expenses in an amount of $20 million.

45.    At a June 13, 2018 Conflicts Committee meeting, senior management provided updates from Hunt regarding Hunt's discussions with a third party referred to in the Proxy Statement as "Company A" which was potentially interested in acquiring InfraREIT. The Conflicts Committee instructed Evercore representatives to inform Company A that it should deal directly with InfraREIT on making any proposal to acquire the Company.

46.    Oncor delivered a revised proposal to the Conflicts Committee on June 21, 2018 for the acquisition of 100% of the equity interests in InfraREIT and remaining ownership interest in the Operating Partnership for net equity consideration of $1.275 billion, which reflected a $40 million payment to Hunt for termination of the management agreement and up to $15 million of lender and advisor fees payable by InfraREIT, resulting in $21.00 per share of InfraREIT common stock or partnership unit, as applicable. Hunt later confirmed it had agreed to drop its request for a $20 million expense reimbursement from Oncor. On July 24, 2018, Oncor confirmed this was its best and final offer.

47.    On June 25, 2018, a special subcommittee of the Conflicts Committee directed Evercore representatives to contact six potential counterparties identified by the special subcommittee during its discussion, including Company A.

48.    On July 31, 2018, InfraREIT and Company B entered into a limited confidentiality agreement.

49.     On July 18, 2018, Company A delivered to Evercore representatives a proposal to acquire 100% of the outstanding equity interests in InfraREIT and the Operating Partnership for cash consideration of $1.350 billion, less deductions for Hunt-related contractual obligations and transaction fees and expenses.  Company A revised its proposal on July 28, 2018 to an indicative price of $20.92 per InfraREIT share which reflected a gross purchase price of $1.35 billion less a $40 million payment to Hunt for termination of the management agreement, a $20 million payment to Hunt for reimbursement of transaction fees and an aggregate of $20 million of transaction fees and lender consent fees payable by InfraREIT.

50.     On July 31, 2018, Hunt delivered a letter to the Conflicts Committee in which Hunt undertook to promptly engage and continue discussions with Company A to attempt to reach agreement on an acquisition of InfraREIT by Company A.

51.     On August 1, 2018, defendants Gordon and Wolf, on behalf of the Conflicts Committee, together with senior management and representatives from Hunton, met with defendant H. Hunt and other Hunt representatives to present a proposed term sheet for a possible alternative under which InfraREIT and Sharyland could be combined and then pursue a third-party sales process for such combined entity ("the Buy All / Sale").  The parties discussed the alternative approach outlined therein should the Company be unable to execute on the proposed Oncor transaction or another alternative transaction in the coming weeks.

52.     On August 7, 2018, defendants Gordon and Wolf, on behalf of the Conflicts Committee, together with senior management, met with defendant H. Hunt and other Hunt representatives to request that Hunt make further financial concessions that would allow for an increase in the price per share of common stock payable to InfraREIT stockholders in the proposed Oncor transaction by approximately $0.50 to $1.00 per share.

53.     By letter dated August 16, 2018, Hunt responded to the Conflicts Committee's request, stating it was not willing to make additional financial concessions.

54.     On September 6, 2018, Hunt informed the Conflicts Committee that significant progress had been made since July 31, 2018 in discussions and negotiations with Company A regarding a term sheet between Company A and Hunt with respect to alternative arrangements designed to facilitate an acquisition of InfraREIT by Company A.

55.     Over the next few weeks, the parties and their advisors negotiated terms of a transaction and merger agreement.

56.     Having not received a response from Company A on an improved indicative offer price, InfraREIT and Oncor finalized the terms of the Proposed Transaction.

57.     At an October 17, 2018, Conflicts Committee meeting, Evercore rendered its fairness opinion on the Proposed Transaction with Oncor.  Following discussion, the Conflicts Committee approved the Merger Agreement and the Asset Exchange agreement.  Immediately following the Conflicts Committee meeting, the Board met and approved the Merger Agreement.

58.     In connection with the announcement of the Proposed Transaction on October 18, 2018, the Company announced the commencement of its go-shop process.

59.     At the direction of the Conflicts Committee, Evercore contacted 37 potential acquirers.  One potential strategic buyer and three potential financial buyers entered into confidentiality agreements with the Company and were granted access to due diligence.

60.     On November 16, 2018, one of these parties, referred to in the Proxy Statement as "Company C," delivered a proposal to acquire all of the outstanding equity interests in InfraREIT and the Operating Partnership for $22.00 per share of common stock and partnership unit, but ultimately terminated discussions with InfraREIT on December 3, 2018.

**The Proposed Transaction**

61.    On October 18, 2018, InfraREIT issued a press release announcing the Proposed

Transaction, which states, in relevant part:

> DALLAS, Oct. 18, 2018 -- InfraREIT, Inc. (NYSE: HIFR) ("InfraREIT" or the "Company") today announced that it has entered into a definitive agreement to be acquired by Oncor Electric Delivery Company LLC ("Oncor") for $21.00 per share in cash, valued at approximately $1.275 billion, plus the assumption of approximately $940 million of InfraREIT's net debt, as of June 30, 2018.
>
> ***Transaction Highlights:***
>
> - InfraREIT stockholders to receive $21.00 in cash for each share of InfraREIT common stock, an 18 percent premium to InfraREIT's unaffected share price of $17.79 on January 12, 2018;
> - InfraREIT expects to continue paying regular quarterly dividends of $0.25 per share through the closing of the transaction;
> - Transaction benefits all stakeholders through the acquisition of InfraREIT by Oncor, the largest electric utility in Texas; and
> - After receiving all required approvals, the transaction is expected to close by mid-2019.
>
> As a condition to Oncor's acquisition of InfraREIT, InfraREIT's subsidiary, Sharyland Distribution & Transmission Services, L.L.C. ("SDTS"), and Oncor also signed a definitive agreement with SDTS's tenant, Sharyland Utilities, L.P. ("Sharyland") to exchange, immediately prior to Oncor's acquisition, SDTS's South Texas assets for Sharyland's Golden Spread Electric Cooperative interconnection ("Golden Spread Project") located in the Texas Panhandle, along with certain development projects in the Texas Panhandle and South Plains regions, including the Lubbock Power & Light interconnection ("LP&L Project").
>
> Under the terms of the agreement with Oncor, InfraREIT's stockholders will receive $21.00 per share in cash upon the closing of the transaction. The $21.00 per share price represents an 18 percent premium to InfraREIT's unaffected share price of $17.79 on January 12, 2018, the last trading day prior to the time Hunt Consolidated, Inc. ("Hunt") filed an amendment to its Schedule 13D with the United States Securities and Exchange Commission ("SEC") regarding its consideration of alternative arrangements between Hunt and the Company.
>
> InfraREIT expects to continue paying regular quarterly dividends of $0.25 per share through the closing of the transaction, including a pro-rated dividend for any partial quarter prior to the closing.
>
> * * *

14

**Transaction Details**

*Asset Exchange:*
Under the asset exchange agreement with Sharyland and Oncor, SDTS will exchange its South Texas assets for Sharyland's Golden Spread Project and other related assets. The difference between the net book value of the exchanged assets will be paid in cash at closing. Upon closing of the asset exchange and the acquisition of InfraREIT, Oncor will own all of InfraREIT's existing transmission system excluding the South Texas assets and will also own the Golden Spread and LP&L Projects currently owned by Sharyland. Following the asset exchange, Sharyland will operate as an independent utility in South Texas. Additionally, SDTS and Sharyland have agreed to terminate their existing leases in connection with the asset exchange.

*Oncor Merger:*
After the completion of the asset exchange transaction with Sharyland, Oncor will acquire InfraREIT for $21.00 per share in cash. Upon the close of the transaction, Oncor will own and operate all of SDTS's post-asset exchange assets, including the Golden Spread and LP&L Projects. Oncor plans to fund its acquisition of InfraREIT with capital contributions from its owners Sempra Energy and Texas Transmission Investment LLC.

The asset exchange and Oncor merger are mutually dependent on one another and neither will become effective without the closing of the other.

*Arrangements with Hunt:*
InfraREIT is externally managed by Hunt Utility Services, LLC ("Hunt Manager") under its management agreement, which will be terminated upon the closing of the transactions. Under the management agreement, Hunt Manager is entitled to the payment of a termination fee upon the termination or non-renewal of the management agreement. The termination of the management agreement automatically triggers the termination of the development agreement between InfraREIT and Hunt. InfraREIT has agreed to pay Hunt approximately $40.5 million at the closing of the transactions to terminate the management agreement, development agreement, leases with Sharyland, and all other existing agreements between InfraREIT or its subsidiaries with Hunt, Sharyland or their affiliates. That amount is consistent with the termination fee that is contractually required under the management agreement.

*Agreements among Hunt, Oncor and Sempra Energy:*
Concurrently with the execution of the merger agreement and the asset exchange agreement, Sharyland and Sempra Energy have entered into an agreement in which Sempra Energy will purchase a 50 percent limited partnership interest in Sharyland Holdings LP ("Sharyland Holdings"), which will own a 100 percent interest in Sharyland. The closing of Sempra Energy's purchase is a requirement of the asset exchange agreement between SDTS and Sharyland. Additionally, under a separate agreement with Sharyland, Oncor has agreed to operate and

maintain all of Sharyland's assets following the closing of the transactions.

**The Proxy Statement Contains Material Misstatements and Omissions**

62.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to InfraREIT's stockholders.    The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction.

63.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information concerning: (i) InfraREIT's financial projections relied upon by the Company's financial advisor Evercore in its analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Evercore; (iii) the background process leading to the Proposed Transaction; and (iv) potential conflicts of interest faced by Evercore.    Accordingly, InfraREIT stockholders are being asked to make a voting decision in connection with the Proposed Transaction without all material information at their disposal.

*Material Omissions Concerning InfraREIT's Financial Projections*

64.    The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

65.    First, the Proxy Statement omits material information regarding InfraREIT management's financial projections and the financial analyses performed by Evercore.

66.    For example, in connection with Evercore's *Discounted Cash Flow Analysis ("DCF")* of InfraREIT, the Proxy Statement sets forth that:

> Evercore performed a discounted cash flow analysis to value the Company common stock utilizing the Company financial projections. Evercore calculated an implied equity value per share range of the Company common stock as of January 1, 2019 by discounting back to present value the Company's discrete

unlevered free cash flows from January 1, 2019 through December 31, 2022.
Evercore estimated terminal values by (1) applying the perpetuity growth method,
utilizing a range of discount rates, a range of estimated perpetuity growth rates
and the Company's assumed terminal year unlevered free cash flows, which was
based on unlevered free cash flow for the year ending December 31, 2022 and
adjusted to remove changes in working capital, as provided by senior
management, and (2) utilizing a range of estimated price-to-earnings, referred to
in this section as "P/E," exit multiples for the "first forward year" (as defined and
described under "— *Peer Group Trading Analysis*" below) to the Company's net
income for the year ending December 31, 2023, which Evercore assumed to be
consistent with net income for the year ending December 31, 2022.

Proxy Statement at 63.  The Proxy Statement, however, fails to disclose the Company's

unlevered free cash flows ("UFCFs") from January 1, 2019 through December 31, 2022, utilized

by Evercore in its *DCF*.  The Proxy Statement further fails to disclose the definitions of

InfraREIT's UFCFs as well as the line items used to calculate UFCFs, relied upon by Evercore

in its DCF.

67.     Further, in connection with Evercore's *Dividend Discount Analysis ("DDA")* of

InfraREIT, the Proxy Statement sets forth that:

Evercore performed a dividend discount analysis to value the Company common
stock utilizing the Company financial projections and taking into account the fact
that SDTS will be required to file a new rate case in the calendar year 2020 (as
described under the section of this proxy statement entitled "— *Background of the
Mergers*"), among other things. Evercore calculated an implied equity value per
share range of the Company common stock as of January 1, 2019 by discounting
back to present value the Company's projected total cash flows to equityholders
(through dividends and share repurchases) from January 1, 2019 through
December 31, 2022.

*Id.* at 64.  Yet, the Proxy Statement fails to set forth the Company's projected total cash flows to

equityholders (through dividends and share repurchases) from January 1, 2019 through

December 31, 2022, utilized by Evercore in its *DDA*.

68.     The omission of this information renders the statements in the "Forward-Looking

Financial Information" and "Opinion of the Financial Advisor to the Conflicts Committee"

sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Evercore's Financial Analyses***

69.    The Proxy Statement describes Evercore's fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of Evercore's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, InfraREIT's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Evercore's fairness opinion in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to InfraREIT's stockholders.

70.    With respect to Evercore's *DCF* of InfraREIT, the Proxy Statement fails to disclose: (i) InfraREIT's UFCFs utilized by Evercore in the analysis; (ii) the changes in working capital, as provided by senior management and removed from the Company's assumed terminal year UFCF for the year ending December 31, 2022, to derive the terminal value for the Company for the perpetuity growth method; (iii) quantification of the inputs and assumptions underlying the discount rates ranging from 6.0% to 7.0% and 5.0 to 6.0% used in the analysis; (iv) InfraREIT's net debt; and (v) the implied terminal multiples and perpetuity growth rates resulting from the analysis.

71.    With respect to Evercore's *DDA*, the Proxy Statement fails to disclose: (i) the Company's projected total cash flows to equityholders (through dividends and share repurchases) from January 1, 2019 through December 31, 2022; and (ii) quantification of the

inputs and assumptions underlying the discount rates ranging from 7.5% to 9.5% and 6.0% to 8.0% used in the analysis.

72.    With respect to Evercore's *Peer Group Trading Analysis*, the Proxy Statement fails to disclose: (i) Evercore's rationale for weighting the Selected Company Peers' median 2019 P/E and 2020 P/E multiples with a 25.0% and a 75.0% weighting; and (ii) quantification of the net income figures for the Company that Evercore applied P/E multiples to in order to derive an implied equity value per share range.

73.    With respect to Evercore's *Precedent Transaction Analysis*, the Proxy Statement fails to disclose: (i) the individual multiples and financial metrics for each of the selected transactions analyzed by Evercore; and (ii) quantification of the net income figures for the Company that Evercore applied P/E multiples to in order to derive an implied equity value per share range.

74.    When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

75.    The omission of this information renders the statements in the "Opinion of the Financial Advisor to the Conflicts Committee" and "Forward-Looking Financial Information" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

76.    The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

19

77.    For example, in connection with the sale process, the Proxy Statement states that "[b]eginning in February 2018 and ending in May 2018, with the assistance of Gibson, Dunn & Crutcher LLP, referred to in this proxy statement as "Gibson Dunn," corporate counsel to InfraREIT, and Hunton, InfraREIT entered into approximately 30 confidentiality agreements with various potential counterparties identified by Morgan Stanley, including Oncor and Sempra." *Id*. at 35.  The Proxy Statement further discloses that on July 31, 2018, InfraREIT and Company B entered into a limited confidentiality agreement.  *See id.* at 40.  In addition, in connection with the go-shop process, the Proxy Statement sets for that "[o]ne potential strategic buyer and three potential financial buyers, which included . . . Company C,[] entered into confidentiality agreements with InfraREIT and HCI."  *Id.* at 50.  The Proxy Statement fails, however, to expressly indicate whether these confidentiality agreements are still in effect and/or contain "don't ask, don't waive" standstill provisions that are presently precluding these parties from making a topping bid for the Company.

78.    The disclosure of the existence and terms of any confidentiality agreements InfraREIT entered into with any other party is crucial to InfraREIT's stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company

79.    In addition, the Proxy Statement sets forth that at the Conflicts Committee's meetings held on March 20, 2018, April 9, 2018 and May 1, 2018 senior management reviewed its financial projections for various de-REIT scenarios and the conflicts committee approved such financial projections for use by representatives from Evercore.  *Id*.  The Proxy Statement fails, however, to disclose the various de-REIT scenarios that were reviewed and further fails to disclose senior management's financial projections for the various de-REIT scenarios.

80.    Moreover, the Proxy Statement fails to disclose the terms of the "Buy All / Sale" transaction term sheet developed by the Company's senior management and delivered to Hunt on August 1, 2018.

81.    The omission of this information renders the statements in the "Background of the Mergers" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Potential Conflicts of Interest Faced by Evercore***

82.    The Proxy Statement also fails to disclose material information concerning potential conflicts of interest faced by Evercore.

83.    For example, the Proxy Statement sets forth that:

> Since January 1, 2015, Evercore and its affiliates provided financial advisory services to the Company, for which Evercore received a fee of $0.5 million. In addition, since January 1, 2015, Evercore provided financial advisory services regarding matters unrelated to the Company to (i) OpTrust Infrastructure N.A. Inc., referred to in this proxy statement as "OpTrust," and John Hancock Life Insurance Company (U.S.A.), referred to in this proxy statement as "John Hancock," each of which owns more than 5% of the Company common stock, (ii) Sempra, an affiliate of Oncor, (iii) OMERS Private Equity (LP Interests), referred to in this proxy statement as "OMERS," and (iv) GIC Private Limited, referred to in this proxy statement as "GIC." Evercore Group L.L.C. received fees for the rendering of such services to each of OpTrust, John Hancock, Sempra, OMERS and GIC, including the reimbursement of expenses.

*Id.* at 69.  However, the Proxy Statement fails to disclose the amount of compensation Evercore and its affiliates received for such financial advisory services performed for each of OpTrust, John Hancock, Sempra, OMERS and GIC.

84.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

21

85.    The omission of this information renders the statements in the "Opinion of the Financial Advisor to the Conflicts Committee" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

86.    The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

87.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

88.    During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

89.    By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the Company's financial projections, relied upon by Evercore in its analyses, the data and inputs underlying the financial

valuation analyses that fairness opinion provided by Evercore, the background process leading to the Proposed Transaction and Evercore's potential conflicts of interest. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

90.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.

91.     By reason of the foregoing, defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

92.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

93.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

94.     The Individual Defendants acted as controlling persons of InfraREIT within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of InfraREIT and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

95.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

96.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Proxy Statement.

97.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

98.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

99.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, InfraREIT's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of InfraREIT, and against defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to InfraREIT stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: January 17, 2019

Respectfully submitted,

/s/ William B. Federman
William B. Federman, TBA #00794935
**FEDERMAN & SHERWOOD**
2926 Maple Ave., Suite 200
Dallas, TX 75201
Telephone:    (214) 696-1100
Facsimile:    (214) 740-0112
Email:  wbf@federmanlaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned certifies as follows:

1.      I have reviewed the complaint in this matter against InfraREIT, Inc. ("InfraREIT") and others and authorized the filing thereof.

2.      I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in any private action.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      My transactions in InfraREIT securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

5.      I have not sought to serve or served as a class representative under the federal securities laws in the last three years, other than as listed below (if any):


6.      I will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

*stephen bushansky*
stephen bushansky (Jan 15, 2019)

Stephen Bushansky

| Transaction (Purchase or Sale) | Trade Date | Quantity | Price per Share |
|---|---|---|---|
| Purchase | 12/20/2016 | 100 | $17.75 |
| | | | |
| | | | |